# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| RAMON DICKERSON; TONI DUPLANTIS; BRITNEY SINGLETARY; DARLANE SARACINA; ARMANDO VILLANUEVA; SIMONE ROLLOCK and MARY SMITH individually and on behalf of themselves and all others similarly situated, | Case No. <u>1:21-cv-02098</u> <br><br> **<u>SECOND AMENDED CLASS ACTION COMPLAINT</u>** |
| Plaintiffs, <br><br> v. <br><br> COLONIAL PIPELINE COMPANY and DOES 1-100, | DEMAND FOR JURY TRIAL |
| Defendants. | |

Plaintiffs RAMON DICKERSON; TONI DUPLANTIS; BRITNEY SINGLETARY; DARLANE SARACINA; ARMANDO VILLANUEVA; SIMONE ROLLOCK and MARY SMITH, on behalf of themselves and all others similarly situated (collectively, "Plaintiffs"), bring this action (hereinafter the "Action") against Defendants COLONIAL PIPELINE COMPANY and DOES 1-100 (collectively, "Defendants" or "Colonial Pipeline Company"), seeking monetary damages, restitution, and/or injunctive relief. Plaintiffs make the following allegations upon personal knowledge and on information and belief derived from, among other things, investigation of counsel and facts that are a matter of public record.

## I.    Introduction

1.    Defendants operate the Colonial Pipeline ("Colonial Pipeline") According to CNBC, "[t]he pipeline is a critical part of U.S. petroleum infrastructure."  The pipeline stretches 5,500 miles and carries nearly half of the East Coast's fuel supply, approximately 2.5 million barrels per day of gasoline, diesel fuel, heating oil and jet fuel.

2.    On May 7, 2021, a ransomware attack penetrated the Defendants' billing software. However, rather than find another way to figure out how to bill their customers, fuel terminal operators and other distributors of gasoline, the Defendants opted to shut down the pipeline entirely.

3.     In so doing, the Defendants recklessly and intentionally halted the supply of gasoline and other fuel products to much of the east coast of the United States. At one point, thousands of gasoline stations on the east coast did not have gasoline and the price of gasoline exceeded levels not seen in decades. The Defendants' conduct caused special harm to consumers and businesses in the form of higher gasoline prices, as well as inflated the cost of delivery services and goods transported thereby, including harm to harm to the Plaintiffs and the members of the putative Class. The harm caused by the Defendants likely exceeds hundreds of millions of dollars.

4.     Plaintiffs bring this Action to seek redress in the form of restitution, damages (including trebled damages), and reasonable attorney's fees and costs for the injuries resulting from the Defendants' conduct.

## II.    Jurisdiction and Venue

5.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount-in-controversy, exclusive of costs and interests, exceeds the sum of $5,000,000.00, in the aggregate as there are well over 100 members of the Classes that are known to exist, and this is a class action in which at least one Plaintiff is from a different State than the Defendants. Namely, Defendants are headquartered in this District while Plaintiffs Dickerson, Duplantis,

Saracina, and Villanueva are residents of the States of North Carolina, Louisiana, Pennsylvania and Texas, respectively.

6.      This Court has personal jurisdiction because, among other reasons, Defendant Colonial Pipeline Company is located in Alpharetta, Georgia.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because the Defendants reside in this District, is a resident of the State of Georgia and many of the acts complained of occurred within this district.

**III.    Parties**

      **a.  Plaintiffs.**

8.      Plaintiff Ramon Dickerson is a North Carolina resident.

9.      Plaintiff Ramon Dickerson purchased gasoline at retail which, as a result of Defendant's conduct, was higher than it otherwise would have been but for the shutdown of the Colonial Pipeline. Plaintiff made purchases for gasoline at retail during the applicable class period in the state of North Carolina. As such, Defendant caused Plaintiff financial injury that would not have occurred but for the Defendant's conduct alleged herein.

10.      Plaintiff Toni Duplantis is a Louisiana resident.

11.      Plaintiff Toni Duplantis purchased gasoline at retail which, as a result of Defendant's conduct, was higher than it otherwise would have been but for the shutdown of the Colonial Pipeline. Plaintiff made purchases for gasoline at retail

3

during the applicable class period in the state of Louisiana. As such, Defendant caused Plaintiff financial injury that would not have occurred but for the Defendant's conduct alleged herein.

12.   Plaintiff Britney Singletary is a Georgia resident.

13.   Plaintiff Britney Singletary purchased gasoline at retail which, as a result of Defendant's conduct, was higher than it otherwise would have been but for the shutdown of the Colonial Pipeline. Plaintiff made purchases for gasoline at retail during the applicable class period in the state of Georgia. As such, Defendant caused Plaintiff financial injury that would not have occurred but for the Defendant's conduct alleged herein.

14.   Plaintiff Darlane Saracina is a Pennsylvania resident.

15.   Plaintiff Darlane Saracina purchased gasoline at retail which, as a result of Defendant's conduct, was higher than it otherwise would have been but for the shutdown of the Colonial Pipeline. Plaintiff made purchases for gasoline at retail during the applicable class period in the state of Pennsylvania. As such, Defendant caused Plaintiff financial injury that would not have occurred but for the Defendant's conduct alleged herein.

16.   Plaintiff Armando Villanueva is a Texas resident.

17.   Plaintiff Armando Villanueva purchased gasoline at retail which, as a result of the Defendant's conduct, was higher than it otherwise would have been but

for the shutdown of the Colonial Pipeline. Plaintiff made purchases for gasoline at retail during the applicable class period in the state of Texas. As such, Defendant caused Plaintiff financial injury that would not have occurred but for the Defendant's conduct alleged herein.

18.    Plaintiff Simone Rollock is a Georgia resident.

19.    Plaintiff Simone Rollock purchased gasoline at retail which, as a result of Defendant's conduct, was higher than it otherwise would have been but for the shutdown of the Colonial Pipeline. Plaintiff made purchases for gasoline at retail during the applicable class period in the state of Georgia. As such, Defendant caused Plaintiff financial injury that would not have occurred but for the Defendant's conduct alleged herein.

20.    Plaintiff Mary Smith is a Georgia resident.

Plaintiff Mary Smith purchased gasoline at retail which, as a result of Defendant's conduct, was higher than it otherwise would have been but for the shutdown of the Colonial Pipeline. Plaintiff made purchases for gasoline at retail during the applicable class period in the state of Georgia. As such, Defendant caused Plaintiff financial injury that would not have occurred but for the Defendant's conduct alleged herein.

   **b.   Defendants.**

5

21.     Defendant Colonial Pipeline Company is an Alpharetta, Georgia-based corporation which is owned by CDPQ Colonial Partners, L.P.; IFM (US) Colonial Pipeline 2, LLC; KKR-Keats Pipeline Investors, L.P.; Koch Capital Investments Company, LLC; and Shell Midstream Operating LLC. Defendant supplies gasoline by way of a major pipeline -- the Colonial Pipeline -- and a network of smaller pipelines along the east coast of the United States.

22.     Defendant Colonial Pipeline Company is a foreign profit corporation which maintains its principal place of business at 1185 Sanctuary Parkway, Suite 100, Alpharetta, Georgia 30009, United States of America.[1] Defendant is incorporated in Delaware with its registration date listed as October 20, 1961. The officers of the Defendant are listed as Joseph A. Blount, Jr. (Chief Executive Officer), Clayton K. Miller (Chief Financial Officer), and David W. Gray (Secretary).[1] The Defendant's registered agent is CSC of Cobb County, Inc., located in Cobb County, Georgia at 192 Anderson Street SE, Suite 125, Marietta, Georgia 30060, United States of America.

23.     Defendant Does 1-100 are subsidiaries and/or affiliates of the Defendant Colonial Pipeline Company that may be responsible for the conduct alleged herein. Such parties are named "Does 1-100" pending discovery.

IV.    **Factual Allegations**

a.  **The Colonial Pipeline**

6

24.     According to the Defendants' own website, the Colonial Pipeline is described as follows:

> Colonial Pipeline is the largest refined products pipeline in the United States, transporting more than 100 million gallons of fuel daily to meet the energy needs of consumers from Houston, Texas to the New York Harbor. Colonial is a value-based energy company, well positioned to provide our services in a cost advantaged, reliable, and environmentally sensitive manner with efficient solutions to meet our customers' needs and the energy demands of the future. We are doing our part to deliver energy that improves lives and keeps the economy moving. At Colonial we are focused on excellence in everything we do. Excellence is woven into our core values. We raise the bar. We exceed the bar. Then we raise it again. But we are more than a pipeline. We are expanding our business to meet the needs of our customers and offer solutions to meet America's energy demands. Our marine logistics division offers shippers on Colonial an alternative to the Houston Ship Channel by providing water access in the Beaumont Port Arthur area. We develop infrastructure for biodiesel, renewable diesel, and other blending activities, and our 28-million-barrel tank storage capacity helps to maintain a stable supply of energy along our delivery system.

25.     The Colonial Pipeline runs up and down the east coast, supplying gasoline to consumers and end-users through its main pipeline, the Colonial Pipeline, and other smaller, ancillary pipelines. The Colonial Pipeline, collectively, "covers more than 5,500 miles and carries more than 100 million gallons of fuel per day, making it the  biggest refined products pipeline in the United States[.]" The shipments of gasoline through the Colonial Pipeline move slowly, "at approximately five miles per hour" through its pipes, which means that any delays, interruptions in service, or other issues can cause lasting and residual effects in the market for gasoline on the east coast of the United States.

26. According to the Colonial Pipeline Company's website, "[p]revention and detection are the keys to avoiding pipeline emergencies."

### b. The Colonial Pipeline's Obligations to Safeguard its Infrastructure

27. It was entirely foreseeable that the Colonial Pipeline would be a target for a ransomware attack or other form of cyber security breach.

28. Cybercrime is a well-known risk that should be at the top of any list of potential issues that could occur with respect to infrastructural necessities – like power grids, utilities, and, like in the immediate case, gas pipelines.

29. For example, in 2015, cyberwarfare crippled Ukraine's power grid, and, in 2017, a Russian government-sponsored hacking group called "Dragonfly" or "Energetic Bear" was able to penetrate control rooms' online infrastructures for electrical utilities in the United States in 2017.  In 2019, hackers penetrated the critical infrastructure systems of two cities in Florida that were forced to pay $600,000 in ransom to recover from the attack. More recently, in 2020, an Austin, Texas-based company called Solarwinds, which "sells software that lets an organization see what is happening on its networks" was penetrated when "hackers inserted malicious code" into the Solarwinds software platform. That attack, which was credited to Russian intelligence, was able to penetrate and disrupt "multiple [United States government] federal agencies and at least 100 private companies."

30.     Specifically, with respect to gas pipelines, from 2011 to 2012, hackers made multiple, coordinated cyber attacks targeting U.S. pipeline computer systems. The attacks targeted nearly two dozen gas pipeline companies.

31.     Each of these high-profile events, along with the scores of well publicized data breaches, including Home Depot and Equifax, serve as notice for all critical infrastructures, including the Colonial Pipeline, the necessity to adequately protect servers and networks which are used by those infrastructures to supply American citizens with the critical commodities and services they need to function.

32.     Additionally, the United States' federal agency, the Cybersecurity & Infrastructure Security Agency ("CISA"), provide training to critical infrastructure systems like the Colonial Pipeline. Such systems must complete various exercises consistent with the agency's purpose, which is to work "with partners to defend against today's threats and collaborating to build more secure and resilient infrastructure for the future." The existence and support of an entire federal agency dedicated to securing critical infrastructure systems, like the Colonial Pipeline, is further notice to those very same infrastructures about the possibility of cybersecurity attacks like the one alleged herein.

33.     As a utility that serves millions of people on the east coast of the United States, the Defendants owe a duty to its end users to keep the pipeline running. Additionally, as a result of the aforementioned previous ransomware attacks on

critical infrastructures in the United States, and due to the existence of CISA, the Defendants are on notice that ransomware is something that needs to be actively protected against with the utmost seriousness.

34.    The Colonial Pipeline, like an electric company or a gas company, functions as a public utility and thus has a public duty imposed upon it to continually provide service. This duty extends to the Defendants' responsibility to take reasonable precautions against foreseeable potential threats to their provision of service – inclusive of cybersecurity incidents like the one alleged herein.

35.    Additionally, and alternatively, a party who creates a situation through negligent conduct – like the prices imposed on consumers on the east coast who could not afford gasoline and suffered harm as a result thereof due to the Defendants' lack of reasonable cybersecurity protocols – has a duty to mitigate the harm it causes.

### c.  The Hack

36.    Hackers attached the Colonial Pipeline's billing system with ransomware, which did not harm the gas-delivering functionality of the pipeline itself.

### i.    Understanding Ransomware

37.    According to CISA,

Ransomware is an ever-evolving form of malware designed to encrypt files on a device, rendering any files and the systems that rely on them unusable. Malicious actors then demand ransom in exchange for decryption. Ransomware actors often target and threaten to sell or leak

exfiltrated data or authentication information if the ransom is not paid. In recent years, ransomware incidents have become increasingly prevalent among the Nation's state, local, tribal, and territorial (SLTT) government entities and critical infrastructure organizations. Malicious actors continue to adjust their ransomware tactics over time, to include pressuring victims for payment by threatening to release stolen data if they refuse to pay, and publicly naming and shaming victims as secondary forms of extortion. Malicious actors engage in lateral movement to target critical data and propagate ransomware across entire networks. These actors also increasingly use tactics, such as deleting system backups, that make restoration and recovery more difficult or infeasible for impacted organizations.

38.   CISA states the following are at risk for ransomware attacks: "[a]nyone with a computer connected to the internet and anyone with important data stored on their computer or network is at risk, including government or law enforcement agencies and healthcare systems or other critical infrastructure entities."

39.   With respect to the impact of ransomware, CISA states,

Ransomware can be devastating to an individual or an organization. Some victims pay to recover their files, but there is no guarantee that they will recover their files if they do. Recovery can be a difficult process that may require the services of a reputable data recovery specialist. Ransomware incidents can severely impact business processes and leave organizations without the data they need to operate and deliver mission-critical services. The monetary value of ransom demands has increased, with some demands exceeding $1 million. Ransomware incidents have become more destructive and impactful in nature and scope. The economic and reputational impacts of ransomware incidents, throughout the initial disruption and, at times, extended recovery, have also proven challenging for organizations large and small.

40.     With respect to who malicious ransomware actors are, CISA states, "[m]alicious actors can be nation-state actors trying to cause harm to critical infrastructure, or cybercriminals trying to enrich themselves."

41.     With respect to mitigations that can be used to resolve the problems caused by malicious ransomware, CISA states, "CISA recommends the following precautions to protect users against the threat of ransomware:

- Update software and operating systems with the latest patches. Outdated applications and operating systems are the target of most attacks.

- Never click on links or open attachments in unsolicited emails.

- Back up data on a regular basis. Keep it on a separate device and store it offline.

- Follow safe practices when using devices that connect to the Internet."

42.     With respect to other best practices against malicious ransomware, CISA states, "[i]n addition, CISA also recommends that organizations employ the following best practices:

- CISA released a guide for parents, teachers and school administrators that provides information to prevent or mitigate malicious cyber actors from targeting kindergarten through twelfth

12

grade (K-12) educational institutions, leading to ransomware attacks, theft of data, and the disruption of learning services.

- Restrict users' permissions to install and run software applications, and apply the principle of "least privilege" to all systems and services. Restricting these privileges may prevent malware from running or limit its capability to spread through a network.

- Use application allow listing to allow only approved programs to run on a network.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses."

### ii.    Colonial Pipeline Failed to Protect its Cybersecurity Infrastructure

43.    At some point on or prior to May 7, 2021, malicious ransomware penetrated the Colonial Pipeline's online systems as a result of the Defendants' failure to adequately protect its critical infrastructure (the "Hack"). The Federal

Bureau of Investigation ("FBI") was notified on May 7, 2021 per a statement by the FBI on May 9, 2021.

44.    Beginning on or after May 7, 2021, the Colonial Pipeline then released a series of updates that focused on how it "took certain systems offline to contain the threat. These actions temporarily halted all pipeline operations and affected some of our IT systems[.]"

45.    Later, it was disclosed that, a previously employed employee of the Defendants used an old password and login information to gain unauthorized access to the pipeline's VPN. This information became known in testimony to the United States House Committee on Homeland Security which held a hearing that focused on the Colonial Pipeline's data breach. In that testimony, it became known that the earliest date of compromise of the Colonial Pipeline's VPN occurred on April 29, 2021 – approximately one week before hackers penetrated the Colonial Pipeline's system with ransomware. This means that Colonial Pipeline was not actively monitoring its VPN – and that it did not see that a previous employee's login information had been used (and continued to be used) to gain access to the Colonial Pipeline's system.

46.    This reveals two critical failures of the Defendants to safeguard its system: first, that the Defendants failed to deactivate the login information and credentials of previous employees when they departed the company, and second,

that the Defendants were not critically monitoring potential compromises of its cybersecurity systems. The Defendants could have avoided both failures – and both were entirely foreseeable components to what lead up to the hacking discussed herein.

47.     Some of the most incriminating information was revealed in the Congressional testimony –that "prior to the [hacking]," the Transportation Safety Administration ("TSA") "asked Colonial Pipeline on no less than thirteen occasions to participate in physical and cyber pipeline security assessments. Citing COVID-19, the Colonial Pipeline repeatedly delayed and chose not to participate. On multiple occasions, the Colonial Pipeline did not even bother responding to TSA's emails. In fact, the Colonial Pipeline still has not agreed to participate in the physical assessment, and only agreed to cooperate with TSA's cybersecurity assessment three weeks after the ransomware attack occurred.

48.     On May 10, 2021, the FBI confirmed that the Colonial Pipeline was hacked using "Darkside" ransomware. At some point, Colonial Pipeline made a $4.4 million ransom payment to the perpetrators of the Hack.

49.     On May 12, the Defendant restarted the Pipeline at 5:00 PM. For nearly a week, the Defendants deprived the east coast of the United States of the literal fuel that it takes to power the economy.

50.     After the Colonial Pipeline ransomware attack occurred, news reports and the United States Congress investigation revealed a substantial amount of information publicly.

51.     The hackers were able to penetrate the Colonial Pipeline's systems through a compromised password for the pipeline's virtual private network ("VPN").

52.     This development became known after the Defendants paid a multi-million dollar ransom to the hackers, which was subsequently recovered entirely or in-part by the United States government.

53.     Based on an analysis by the cybersecurity firm, Mandiant, reports indicated that the hackers compromised the VPN account because it lacked multi-factor authentication ("MFA"), which would have added an additional modicum of security beyond just the password itself. Using MFA is a basic security measure that was commonly known prior to and after the Colonial Pipeline hacking. The Defendants failed to use MFA.

54.     Additionally, more information was released with respect to the systems that were specifically affected by the malware at issue.

55.     According to reporting by CNN:

> The company halted operations because its billing system was compromised, three people briefed on the matter told CNN, and they were concerned they wouldn't be able to figure out how much to bill customers for fuel they received.

One person familiar with the response said the billing system is central to the unfettered operation of the pipeline. That is part of the reason getting it back up and running has taken time, this person said.

Asked about whether the shutdown was prompted by concerns about payment, the company spokesperson said, "In response to the cybersecurity attack on our system, we proactively took certain systems offline to contain the threat, which temporarily halted all pipeline operations, and affected some of our IT systems."

At this time, there is no evidence that the company's operational technology systems were compromised by the attackers, the spokesperson added.

56.   Indeed, additional reporting on June 8th revealed that, "[t]hough operations were not compromised, because Colonial Pipeline's billing system was affected and customers could not be charged, the pipeline had to be halted."

### iii.   Colonial Pipeline's Conduct Caused Consumer Harm

57.   The Defendants' shut down of the Colonial Pipeline deprived much of the east coast of the United States of gasoline and disrupted supplies across the entire east coast.

58.   Defendants shut down the pipeline not because the pipeline literally did not work, but because the Defendants chose not to find an alternative way to bill for the consumption of its gasoline or, worse, it purposefully turned the pipeline off as a means to drive up the price of the product it sold by creating a supply restraint. Regardless, the Defendants knowingly shut the pipeline down even through it did

not have to and the Defendants knew at the time that it would drive up the cost of gasoline – the very product the pipeline sells.

59.     According to CNBC, as of May 12, 2021, "68% of gas stations in North Carolina were out of gas … [i]n South Carolina and Georgia 45% of stations [were out of gas], while 49% of stations across Virginia reported outages."

60.     The impact on gasoline prices can be seen in the chart below:



61.     For the first time in six years, the average price of a gallon of gasoline in the United States exceeded $3.00 – and this was due to the Defendant's failure to adequately protect its IT systems and then its shut down of the Colonial Pipeline. The Defendants' conduct harmed Plaintiffs and similarly situated class members, along with the U.S. economy, through higher gasoline prices for consumers and end-users.

**A. Class Action Allegations**

62.     Plaintiffs bring this action on their own behalf and on behalf of all natural persons similarly situated, as referred to throughout this Complaint as "Class members."

63.     Pursuant to Federal Rules of Civil Procedure 23(b)(2) and (b)(3), and (c)(4) as applicable, Plaintiffs propose the following Nationwide Class and Subclass definitions, subject to amendment as appropriate:

> **Nationwide Class**: All entities and natural persons nationally who purchased gasoline from May 7, 2021 through Present and who paid higher prices for gasoline as a result of the Defendant's conduct alleged herein (hereinafter the "Class").

> **Sub-Class.** All entities and natural persons of the states in which the Plaintiffs reside who purchased gasoline from May 7, 2021 through Present who paid higher prices for gasoline as a result of the Defendant's conduct alleged herein.

64.     Pursuant to Federal Rules of Civil Procedure 23(b)(2) and (b)(3), Plaintiffs propose state subclasses as necessary or appropriate.

65.     Excluded from the Class and Subclasses are the Defendants' officers, directors, and employees; any entity in which the Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of the Defendants. Excluded also from the Class and Subclasses are members of the judiciary to whom this case is assigned, their families and members of their staff.

66.     **Numerosity under <u>Federal Rule of Civil Procedure 23(a)(1)</u>**. The members of the Class are so numerous and geographically dispersed that individual joinder of all class members is impracticable.

67.     **Commonality under <u>Federal Rule of Civil Procedure 23(a)(2)</u>**. There are questions of law and fact common to Plaintiffs and Class members, which predominate over any questions affecting only individual class members. These common questions of law and fact include, without limitation:

- Whether Defendants failed to adequately protect their servers and systems from malicious attacks, including malware;

- Whether Defendants failed to implement and maintain reasonable security measures, procedures, and practices appropriate to the nature and scope of maintaining critical infrastructure, like a pipeline;

- Whether Defendants truthfully represented the nature of their security systems, including hacker vulnerability;

- Whether Defendants' data security and cybersecurity measures, procedures, and protocols complied with applicable laws and regulations;

- Whether Defendants' data security and cybersecurity measures, procedures, and protocols complied with applicable industry standards;

- Whether Defendants owed a duty to safeguard its systems and servers from malicious hacks;

- Whether Defendants breached a duty to Plaintiffs and the Class members to safeguard its systems and servers from malicious hacks;

- Whether Defendants knew or should have known that its data security and cybersecurity measures were deficient;

- Whether Plaintiffs and the Class members are owed legally cognizable damages as a result of the Defendant's conduct;

- Whether special damages are due to the Plaintiffs and members of the putative Classes;

- Whether Defendants were negligent;

- Whether Defendants violated the state laws pled herein;

- Whether Defendants breached a public duty;

- Whether Defendants committed a public nuisance;

- Whether the Defendants were unjustly enriched;

- Whether Defendants failed to provide accurate and complete notice of the hack in a timely manner; and,

- Whether Plaintiffs and the Class members are entitled to special damages, disgorgement of profits, damages, treble damages, civil penalties, exemplary damages, punitive damages, and/or injunctive relief.

68. **Typicality under Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of those of the class members because Plaintiffs suffered harm in the form of artificially high prices for gasoline at retail due to the inoperability of the Colonial Pipeline due to the hack and/or due to the Defendants shutting the Pipeline down due to billing issues.

69. **Adequacy of Representation under Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs will fairly and adequately represent and protect the interests of class members, including those from states and jurisdictions where they may not reside. Plaintiffs' counsel are competent and experienced in litigating class actions.

70. **Predominance under Federal Rule of Civil Procedure 23(b)(3).** Defendants engaged in a common course of conduct toward Plaintiffs and the Class members as alleged herein. The common issues arising from Defendants' conduct affecting class members, as described, *supra*, predominate over any individualized

issues. Adjudication of the common issues in a single action has important and desirable advantages of judicial economy.

71. **Superiority under Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most class members would find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

72. **Injunctive Relief is Appropriate under Federal Rule of Civil Procedure 23(b)(2).** Defendants have acted on grounds that apply generally to the Class (and Subclasses) as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

73. **Issue Certification Appropriate under Federal Rule of Civil Procedure 23(c)(4).** In the alternative, this litigation can be brought and maintained

a class action with respect to particular issues, such as Defendant's liability with respect to the foregoing causes of action.

## V.  Causes of Action

**COUNT I**
**NEGLIGENCE**

62.  Plaintiffs repeat and reallege all preceding paragraphs, as if fully alleged herein.

63.  Defendants' Colonial Pipeline supplies a substantial amount of gasoline – the single most critical commodity to the economy and national security -- to a sizable portion of the United States, including to the states of the Plaintiffs named in this Complaint. Defendants make representations about its reliability with respect to the operational functionality of the Colonial Pipeline.

64.  By accepting the duty to deliver a critical commodity and to protect the pipeline in order to keep it running, Defendants had a duty of care to use reasonable means to secure and safeguard its computer systems and gasoline transmission operations. Defendants' duty included a responsibility to implement necessary processes by which it could prevent and/or detect a breach of its computer systems in an expeditious manner, as well as to give prompt notification about the existence of a ransomware attack, in the event one would take place.

65.  Defendants additionally owed a duty of care to use security measures consistent with industry standards and other requirements in order to ensure that its

systems (and the pipeline itself) were adequately protected and safeguarded and would maintain transmission operations even in the event of computer system failure.

66.     Defendants' duty to use reasonable care in protecting its systems (and the pipeline itself) arose because the Defendants are bound by industry standards to protect itself from potential ransomware attacks.

67.     The Defendants also owed a duty to Plaintiffs and the Class not to shut down the pipeline -- when it did not need to do so -- to ensure the availability of the critical fuel supply.  When Defendants shut down the pipeline they intentionally created a reasonably foreseeable dangerous condition of the disruption of fuel supplies and had a duty to mitigate any surge in gas prices or unavailability of fuel to consumers. Members of the Class were clearly harmed in being unable to get gas and when it was available, paying a much higher price for it than they otherwise would have if the pipeline had continued to function.

68.     Defendants breached the aforementioned duties.

69.     Defendants did not use reasonable and/or necessary measures in order to uphold the aforementioned duties – and as a result, the Defendant was hacked by malicious ransomware. In addition, Defendants intentionally shut down the pipeline when they did not need to do so.

70.     Specifically, the acts and omissions committed by the Defendant which were/are negligent include (but are not limited to): (1) failing to adopt, implement, and maintain necessary and adequate security measures in order to protect its systems (and, thus, the pipeline); (2) failing to adequately monitor the security of  its networks and systems; (3) failure to ensure that its systems had necessary safeguards to be protected from malicious ransomware; and, perhaps most importantly, (4) failure to ensure that it could maintain its critical fuel transmission operations even in the event of computer system failure; and (5) failure to keep the pipeline running and shutting it down due to concerns unrelated to its functionality or safety.

71.     It was foreseeable that the possibility of malicious ransomware attacks would occur with respect to utilities, like pipelines, as malicious ransomware attacks have occurred with respect to other utilities as discussed in this Complaint. Additionally, it was foreseeable that the Defendants' failure to use reasonable measures to protect its computer systems and transmission operations would result in harm to the Plaintiffs and the members of the Class.

72.     Thus, it was foreseeable that the failure to adequately safeguard the Pipeline's systems would result in injuries to the Plaintiffs and the members of the Class.

73.     It was also foreseeable that by Defendants shutting down the Pipeline, even though it was operational, there would be resulting harm to consumers.

74.     Plaintiffs and Class members are entitled to compensatory and consequential damages as a result of the Defendants' conduct.

75.     Plaintiffs and Class members are also entitled to injunctive relief requiring the Defendants to (1) strengthen its cybersecurity systems and monitoring procedures and (2) submit future annual audits of those systems and monitoring procedures.

## COUNT II
## DECLARATORY JUDGMENT
## 28 U.S.C. §§ 2201, *et seq.*

76.     Plaintiffs repeat and realleges all preceding paragraphs, as if fully alleged herein.

77.     Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

78.     Plaintiffs allege that the Defendant's data security measures were inadequate. Plaintiffs and members of the Class continue to suffer damages at the time of the filing of this Complaint in the form of increased prices for gasoline at

retail as well as gasoline outages – and any other ancillary damages that could be a result of these issues.

79.      Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

80.      Defendants owe a duty to Plaintiffs and to the members of the Class to use adequate cybersecurity measures in order to keep the Colonial Pipeline secure and operational and Defendants continue to breach this duty by failing to employ reasonable measures to protect its systems (and, thus, the Pipeline).

81.      This Court also should issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with law and industry standards.

82.      If an injunction is not issued, Plaintiffs will suffer irreparable injury, and lack an adequate legal remedy, in the event of another malicious ransomware hack. The risk of another such hack is real, immediate, and substantial.

83.      The hardship to Plaintiffs if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued.

84.      Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another malicious ransomware hack, thus eliminating the additional injuries that would result to Plaintiffs and members of the Class.

**COUNT III**
## VIOLATIONS OF THE NORTH CAROLINA UNFAIR
## AND DECEPTIVE TRADE PRACTICES ACT
### N.C. Gen. Stat. § 75-1.1., *et. seq.*

85.    Plaintiffs repeat and reallege all preceding paragraphs as if fully alleged herein.

86.    The Defendants engaged in an unfair or deceptive act or practice when the Defendants knowingly shut down the Colonial Pipeline while it was still functional, dramatically increasing the price of gasoline – which benefited the Defendants and harmed the Plaintiffs and the members of the Class.

87.    Defendants' conduct violated industry standards, which constitutes an unfair practice.

88.    This conduct is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers, like the Plaintiffs and the members of the Class. This amounts to an inequitable assertion of the Defendants' power or position over the Plaintiffs and the members of the Class.

89.    Additionally, this conduct offends public policy, which constitutes an unfair practice.

90.    This conduct affected commerce. Commerce is defined as "all business activities however denominated[.]"

91.    Outright fraud is not required by the statute.

92.    The intent of the Defendants are irrelevant.

93.     The harm to Plaintiffs and members of the Class had substantial effects on in-state business operations, including the sale of gasoline in the states resided in by the Plaintiffs (which include but is not limited to North Carolina).

94.     The unfair act directly and proximately caused actual injury to the Plaintiffs and the members of the Class.

95.     As such, the Plaintiffs and the members of the Class seek the maximum allowable damages under the statute – including but not limited to actual damages, statutory damages, treble damages, other ancillary damages, attorney's fees, and other costs.

## COUNT IV
## BREACH OF PUBLIC DUTY
## O.C.G.A. § 51-1-7

96.     Plaintiffs repeat and reallege all preceding paragraphs, as if fully alleged herein.

97.     Plaintiffs were owed a public duty by the Defendants.

98.     Defendants had a duty to keep the pipeline running while it was operational.

99.     Defendants breached that duty when they shutdown the pipeline even though it was still operational, and, more specifically, functional with respect to the distribution of gasoline.

100.   Plaintiffs were harmed – and the harm came in the amount of special damages which did not arise as a result of the public's conduct.

101.   As such, Defendants owe special damages to the Plaintiffs.

## COUNT V
## PUBLIC NUISANCE

102.   Plaintiffs repeat and reallege all preceding paragraphs, as if fully alleged herein.

103.   A right of action exists where a public nuisance exists in which the public did not participate.

104.   Defendants created a public nuisance when they knowingly deprived the public of access to gasoline.

105.   Plaintiffs were harmed – and the harm came in the amount of special damages which did not arise as a result of the public's conduct.

106.   As such, Defendants owe special damages to the Plaintiffs.

## COUNT IV
## UNJUST ENRICHMENT

107.   Plaintiffs repeat and realleges all preceding paragraphs, as if fully alleged herein.

108.   "Under Georgia law, 'the theory of unjust enrichment applies when there is no legal contract and when there has been a benefit conferred which result in an unjust enrichment unless compensated.'" *Clark v. Aaron's Inc.*, <u>914 F. Supp.</u>

2d 1301, 1309 (N.D. Ga. 2012) (quoting *Smith Serv. Oil Co. v. Parker*, 549 S.E.2d 485, 487 (Ga. 2001)).

109.   In this case, a benefit was conferred onto the Defendant by way of increased gasoline prices when the Defendants decided to stop the Pipeline from functioning. This benefit is in the form of costs for gasoline that were higher than they otherwise would have been but for the Defendant's conduct.

110.   The Defendants have not compensated the Plaintiffs or the members of the Class for this benefit conferred upon it, which is unjust in both law and equity.

111.   And the failure to compensate the Plaintiffs or the members of the Class for this benefit is unjust.

112.   The Defendants did not need to turn off the Pipeline at the time that it is alleged to have done so; it shut down the Pipeline as a way to keep track of its billing as alleged herein, and, potentially, as a means to create a restraint on supply which would drive up the prices it would receive from its intermediary customers which then would get passed down to downstream consumers, like Plaintiffs and the members of the Class.

113.   Thus, Plaintiffs and the members of the Class demand a disgorgement of the profits made by the Defendants as a result of the supply constraints the Defendants unnecessarily imposed, which drove up the price of gasoline to downstream consumers, like Plaintiffs and the members of the Class.

**B. Prayer for Relief**

WHEREFORE, Plaintiffs pray for judgment as follows:

A. For an Order certifying this Action as a class action and appointing Plaintiffs and their Counsel to represent the Class;

B. For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein;

C. For equitable relief compelling Defendants to utilize appropriate methods and policies with respect to data and cybersecurity;

D. For equitable relief requiring restitution and disgorgement of the profits wrongfully retained as a result of Defendants' wrongful conduct;

E. For an award of actual damages, exemplary damages, compensatory damages, statutory damages, special damages, treble damages and statutory penalties, in an amount to be determined, as allowable by law;

F. For an award of punitive damages, as allowable by law;

G. For an award of attorneys' fees and costs, and any other expense, including reasonable expert witness fees;

H. Pre- and post-judgment interest on any amounts awarded; and

I. Such other and further relief as this court may deem just and

proper.

## VI.    Jury Trial Demand

114.   Plaintiffs hereby demand a jury trial for all claims so triable.

Dated: July 23, 2021                    Respectfully submitted,

/s/ James Evangelista
James Evangelista
**EVANGELISTA WORLEY LLC**
500 Sugar Mill Road, Bldg. A, Suite 245
Atlanta, Georgia 30350
Tel.:        (404) 600-0945
Email:       jim@ewlawllc.com

Harper Segui*
Daniel Bryson*
Rachel Soffin*
Gregory F. Coleman*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
217 Lucas Street, Suite G
Mount Pleasant, South Carolina 29464
Tel.:        (919) 500-5000
Fax.:        (919) 600-5035
Email:       hsegui@milberg.com
             dbryson@milberg.com
             rsoffin@milberg.com
             gcoleman@milberg.com

Jennifer Kraus Czeisler*
Blake Yagman*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
100 Garden City Plaza, Suite 500
Garden City, New York 11530

Tel.:        (212) 594-5300
Email:       jczeisler@milberg.com
             byagman@milberg.com

*Pro Hac Vice Admitted or To Be Submitted*